Roberto Antonio
AGUILERA–COTA, Petitioner,

v.

U.S. IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 88–7389.

United States Court of Appeals,
Ninth Circuit.

Submitted Oct. 30, 1989.
Decided Sept. 21, 1990.

Rosemary J. Esparza, Los Angeles, Cal., for petitioner.

Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civ. Div., Michael C. Johnson, Sp. Asst. U.S. Atty., Los Angeles, Cal., for respondent.

Before NORRIS, REINHARDT and TROTT, Circuit Judges.

REINHARDT, Circuit Judge:

Roberto Antonio Aguilera–Cota petitions for review of the decision of the Board of Immigration Appeals (the "BIA") holding him ineligible for asylum. We grant the petition for review, reverse the BIA's decision and remand so that the Attorney General may exercise his discretion under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1990) (the "Act").

## FACTS

Roberto Antonio Aguilera–Cota fled El Salvador in March of 1984. Before he fled the country, Aguilera worked for the Central Board of Elections during the 1983–1984 presidential elections. As a government employee, he had been issued a government identification card. Although he was politically neutral, he did not feel safe working for the government. In early March, Aguilera received a threatening letter with his name on it. The handwritten, anonymous note was left under his door at home, and it warned him to quit his job or pay the consequences. Aguilera destroyed the note. Several days later, an unidentified man came to his house looking for him. The man questioned his sister concerning Aguilera's whereabouts and his job with the government. He told her he was going to return. Aguilera, fearing for his life, fled El Salvador a few days later, and on March 18, 1984, entered the United States. Aguilera's cousin had been killed by gunshots around the time that Archbishop Romero was assassinated, and his niece had been wounded by bullets when the guerrillas and the military engaged in combat in front of his home. Before he entered government service, Aguilera's house had been ransacked by the military at one o'clock in the morning, and he had twice been forced off buses and interrogated and detained by the army.

## STANDARD OF REVIEW

We review the BIA's factual findings under the "substantial evidence" standard.

*Rivas v. INS,* 899 F.2d 864, 866 (9th Cir. 1990) (citing *Dias–Escobar v. INS,* 782 F.2d 1488, 1492 (9th Cir.1986)). "Questions of law, such as whether the BIA applied the appropriate legal standard, are reviewed *de novo." Arteaga v. INS,* 836 F.2d 1227, 1228 (9th Cir.1988).

## DISCUSSION

Under *Cardoza–Fonseca v. INS,* 767 F.2d 1448 (9th Cir.1985), *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), an alien qualifies for refugee status and is eligible for asylum if he can demonstrate a well-founded fear of persecution. The "well-founded fear" standard has both an objective and subjective component. The objective component " 'requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution.' " *Rodriguez–Rivera v. INS,* 848 F.2d 998, 1002 (9th Cir.1988) (quoting *Rebollo–Jovel v. INS,* 794 F.2d 441, 443 (9th Cir.1986)). "That the objective facts are established through credible and persuasive testimony of the applicant does not make those fears less objective." *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984). The subjective component requires that the applicant have a genuine concern that he will be persecuted. *Id.*

It is not seriously contested that the petitioner has a subjective fear of persecution. However, here, as in so many similar asylum cases, the principal question we must confront is whether that subjective fear has a sufficient objective basis. To the extent that any question exists with respect to the genuineness of petitioner's fear, it is answered by our decision regarding the objective component.

In *Cardoza–Fonseca,* 767 F.2d at 1453, *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434, we held that "asylum applicants must present 'specific facts' through objective evidence to prove either past persecution or 'good reason' to fear future

persecution."[1] Documentary evidence establishing past persecution or threat of future persecution is usually sufficient to satisfy the objective component of the well-founded fear standard. *Id.* at 1453. But we have also recognized that refugees frequently do not possess documentary evidence regarding such events. "Authentic refugees rarely are able to offer direct corroboration of specific threats." *Bolanos–Hernandez*, 767 F.2d at 1285. Where the evidence is not available, the applicant's testimony will suffice if it is credible, persuasive, and specific. "If the alien's own testimony about a threat, when unrefuted and credible, were insufficient to establish the fact that the threat was made, it would be 'close to impossible for [any political refugee] to make out a case for [asylum.]' " *Id.* (quoting *McMullen v. INS*, 658 F.2d 1312, 1319 (9th Cir.1981)).

Aguilera's testimony reveals that his fear of persecution was based primarily on two closely related events: In March 1984, while working for the Central Board of Elections, he received a threatening note. The typed anonymous note warned him to quit his job or pay the consequences. Several days later, a stranger came to his house looking for him. The stranger asked his sister many questions about him, including a number of questions relating to his employment with the government, and told her that he was going to return. Aguilera fled El Salvador several days later.[2]

The BIA and the Immigration Judge (the "IJ") committed a number of legal errors in reaching the conclusion that Aguilera did not have a well-founded fear of persecution.

■ First, the BIA and the IJ failed to recognize that Aguilera fell within the definition of refugee because of his imputed "political opinion." Refugees are persons who flee their native land because of "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (1990). Even though Aguilera did not express a "political opinion" in the typical fashion, he fits within the statutory definition of that term under the doctrine of imputed political opinion. *Lazo–Majano v. INS*, 813 F.2d 1432, 1435 (9th Cir.1987). The threats were based on his employment and presumed support of the government. The anonymous note warned him to quit his government job or pay the consequences. In short, he was specifically threatened because of his perceived adherence to the government's cause.

■ As we have previously held, "In deciding whether anyone has a well-founded fear of persecution or is in danger of losing life or liberty because of a political opinion, one must continue to look at the person from the perspective of the persecutor. If the persecutor thinks the person guilty of a political opinion, then the person is at risk." *Id.* Thus, it is not crucial whether the individual actually espoused the views of the government or whether he was a high level or low level employee; what is determinative is what the persecutors thought. *See also Rivas*, 899 F.2d at 867 ("An alien makes out a case of likelihood of persecution on the basis of imputed political belief if [he] can establish that [his] alleged persecutor is likely to accuse [him] falsely of holding certain political beliefs or engaging

1. To the extent that the Supreme Court declined "to set forth a detailed description of how the 'well-founded fear' test should be applied," 480 U.S. at 448, 107 S.Ct. at 1221, our opinion on this issue continues to be controlling law in this circuit.

2. Prior to these incidents, the petitioner had experienced other episodes that caused him concern. Before he entered government service, his home was ransacked by the military at one o'clock in the morning. They searched for weapons, subversive flyers, and propaganda materials throughout the house. Aguilera was not at home during the raid. Thus, Aguilera, in addition to being a target of persecution by the government's opponents, may also have been a subject of harassment by the government itself. Aguilera also mentions two other incidents in which he was forced off buses and interrogated and detained by the military, but we do not consider them particularly relevant to his claim for asylum. A reasonable interpretation of the latter two incidents would suggest only that Aguilera might, if his luck ran out, be pressed into military service some day.

in certain political acts and that [his] persecutor is likely to harm [him] on the basis of that accusation.") In this case, the undisputed evidence is that Aguilera's status as a government employee caused the opponents of the government to classify him as a person "guilty" of a political opinion. In the conditions of civil unrest which persist in El Salvador, Aguilera and others similarly situated are not always given the opportunity to clarify such misunderstandings before termination with prejudice occurs.[3]

■ The second significant legal error was the use by the BIA and the IJ of an improper standard in evaluating Aguilera's testimony. As a result, they failed to give the proper weight to testimony essential to his case.[4] A review of the IJ's decision reveals that in assessing whether Aguilera met the objective component of the well-founded fear test, the IJ imposed a far more stringent burden on petitioner than we deemed permissible in *Cardoza–Fonseca* and *Bolanos–Hernandez*. This error materially affected the outcome of the proceedings.

It is clear that Aguilera's testimony concerning the threatening note and the visit by a stranger shortly thereafter constitutes "specific evidence" sufficient to "support a reasonable fear that the petitioner faces persecution." *Rodriguez–Rivera*, 848 F.2d at 1002. The IJ, however, did not believe that the note should be accorded much weight because the petitioner did not know who wrote it and because he did not retain it. Aguilera testified that the note was not signed and that he destroyed it after reading it. There is nothing novel about the concept that persecutors cannot be expected to conform to arbitrary evidentiary rules established by the Immigration and Naturalization Service; neither Salvadoran leftists nor Middle Eastern terrorists, such as members of the PLO or the Hezbollah,

have been given adequate notice that our government expects them to sign their names and reveal their individual identities when they deliver threatening messages. We have previously tried to make it clear that asylum applicants are not required to produce documentary evidence of events such as those involved here. As we have said, "Persecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Bolanos–Hernandez*, 767 F.2d at 1285; *see also Zavala–Bonilla v. INS*, 730 F.2d 562, 565 (9th Cir.1984) (the petitioner "could hardly ask the authorities in El Salvador to certify that she would be persecuted should she return").

■ Nor does Aguilera's inability to identify the precise source of the threat render his fear of persecution less justifiable; in fact, an anonymous note may cause even greater anxiety than a signed one, since in the case of an anonymous threat one cannot identify the potential source of harm and may legitimately assume, at least in a violent and chaotic society, that the party making the threat has the ability to carry it out. Moreover, the fact that the petitioner did not possess the note for the IJ to read was irrelevant. As we have noted, "refugees sometimes are in no position to gather documentary evidence establishing specific or individual persecution or a threat of persecution." *Cardoza–Fonseca*, 767 F.2d at 1453. The last thing a victim may want to do is to carry around a threatening note with him. Doing so could cause extended detention, questioning or even torture or death, whichever side happened by chance to stop and search him. When the correct legal standard is applied, it is clear that Aguilera's testimony concerning the note strongly supports his objective fear of persecution.

---

**3.** Moreover, a strong case can be made that persecution based on status as a government employee is covered by another phrase in the statute as well. Although the association or membership clause refers specifically to social groups, the consequences of affiliating oneself with an employer that is anathema, from a social or political standpoint, to armed political rebels would seem clearly to constitute the type

of danger contemplated under the refugee provision. *See* 8 U.S.C. § 1101(a)(42)(A) (1990).

**4.** Because the BIA affirmed the determination of the IJ with only a conclusory discussion of the legal issues, we assume it generally agreed with the IJ's discussion of them. Accordingly, we focus on the IJ's decision.

With respect to the visit by the stranger to petitioner's house, it is equally clear that the IJ committed a serious error when he failed to accord sufficient weight to Aguilera's testimony. In discounting the importance of the interrogation that occurred, the IJ stressed that the stranger never fulfilled his promise of returning to petitioner's home after his initial visit. However, this fact is obviously of no importance. Petitioner left the country in fear for his life a few days after the stranger's appearance at his home and his receipt of the threatening note. Thus, it is wholly without significance that the stranger did not return. There was clearly no need for him to do so. Aguilera heeded the warning in the note, left his government position after the stranger's first visit, and fled the country. Again, it was clear error for the IJ, and thus the BIA to discount this evidence for so arbitrary and illogical a reason. A decision based on reasoning that is patently erroneous cannot stand.[5]

The IJ also found that Aguilera was "not entirely credible" as a witness. We review credibility findings under a substantial evidence standard. *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir.1987). "Although an immigration judge's credibility findings are granted substantial deference by reviewing courts, a trier of fact who rejects a witness's positive testimony because in his or her judgment it lacks credibility should 'offer a specific, cogent reason for [his] disbelief.'" *Id.* (citations omitted). The IJ must not only articulate the basis for a negative credibility finding, but those reasons must be substantial and must bear a legitimate nexus to the finding. Thus, there must be a rational and supportable connection between the reasons cited and the conclusion that the petitioner is not credible. In cases of this nature, where the principal and frequently only source of evidence is the petitioner's testimony, it is particularly important that the credibility determination be based on appropriate factors.

The fact that an IJ considers a petitioner not to be credible constitutes the beginning not the end of our inquiry. As we have stated, "When the Immigration Judge provides specific reasons for questioning a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible." *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988). This is the case, for example, when the IJ makes an adverse credibility finding based on petitioner's "evasiveness." *Turcios*, 821 F.2d at 1400.[6] We do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion, and determine whether the reasoning employed by the IJ is fatally flawed. It is not enough that the IJ has arrived at point B from point A, or that others might also; the question we must answer is: was it reasonable to do so? In *Damaize–Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986), for

---

5. The IJ also erred by improperly discounting collateral evidence which was clearly relevant to Aguilera's application. The IJ found it "difficult to understand" how the death of Aguilera's cousin, who was merely one of "a number of people killed at the same time," and the injury of his niece could possibly affect Aguilera. In addition to the emotional and personal toll these incidents inflicted on the petitioner, the violence was critical background evidence of the general conditions in his country. "[G]eneral information concerning oppressive conditions is relevant to support specific information relating to an individual's well-founded fear of persecution." *Zavala–Bonilla*, 730 F.2d at 564; *see also Bolanos–Hernandez*, 767 F.2d at 1285 ("It should be obvious that the significance of a specific threat to an individual's life or freedom is not lessened by the fact that the individual resided in a country where the lives and freedom of a large number of persons are threatened. If anything ... that fact may make the threat more serious or credible."). The evidence presented was crucial in forming a complete picture of the conditions and the fear under which Aguilera lived in El Salvador.

6. Whether a witness is evasive can be determined objectively from an examination of the record. Demeanor evidence may present a somewhat different problem. We need not consider here, however, how we review an IJ's determination regarding a petitioner's demeanor. In this case, neither the IJ nor the BIA relied on any observations regarding Aguilera's demeanor.

example, the IJ questioned the petitioner's credibility because of his failure to marry the mother of his children. We held that it was impermissible for the IJ to base his negative credibility finding on the petitioner's personal choices in this area. *Id.* "In short, the information relied upon by the IJ to question [the petitioner's] credibility reveals nothing about whether or not [the petitioner] is an honest individual, or whether or not he feared for his safety in [his native land]. The IJ had no legitimate, articulable basis to question [the petitioner's] credibility...." *Id.* at 1338 (citations omitted).

■ Here, the IJ questioned Aguilera's credibility because Aguilera's oral testimony included information not set forth in his asylum application. Aside from the IJ's complaint that Aguilera had no proof that the threatening note had been delivered, the *only* basis for the credibility determination was the IJ's observation that Aguilera had failed to list on his application the two collateral incidents involving his relatives. The IJ's finding—if indeed a statement that an individual is "not entirely credible" may be termed a finding—is not supported by substantial evidence. The requisite nexus is lacking. Aguilera's failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility. In short, the basis for the IJ's finding does not meet the test of legitimacy. *See id.*

Forms are frequently filled out by poor, illiterate people who do not speak English and are unable to retain counsel. Under these circumstances, the IJs cannot expect the answers provided in the applications to be as comprehensive or as thorough as they would be if set forth in a legal brief. In *Martinez–Sanchez v. INS*, 794 F.2d 1396, 1400 (9th Cir.1986), we reversed the IJ's finding that the petitioner was not a credible witness. There the IJ had based his finding on inconsistencies in the record such as the date the petitioner joined a

paramilitary group and the fact that he had listed two children on his asylum application when in fact he had four children. We reversed the IJ and the BIA, stating that such " 'trivial errors' do not constitute 'a valid ground upon which to base a finding that an asylum applicant is not credible.' " *Id.* (citation omitted). *See also Vilorio–Lopez*, 852 F.2d at 1142 (minor inconsistencies in the testimony of two individuals regarding the date of the incident, the length of time the men were sheltered from the death squad, and whether payment was made for their accommodation were not an adequate bases for an adverse credibility finding). If minor inconsistencies or misrepresentations of unimportant facts cannot constitute the basis for an adverse credibility finding,[7] *a fortiori* minor omissions cannot.

■ Clearly, Aguilera did not lie or misrepresent the facts on his asylum application. The IJ offered no explanation why Aguilera's failure to mention the two collateral incidents in his application made him "not entirely credible," since there were *no* contradictions between the information set forth in the application and his testimony. At the hearing, Aguilera testified that his cousin was killed by gunshots around the time that Archbishop Romero was killed, and that his niece was wounded by bullets when the guerrillas and the military engaged in combat in front of his home. While he did not specifically refer to these two incidents in his application, he did subsequently submit copies of his cousin's death certificate and a newspaper article describing the incident involving his niece to support his oral testimony. Nothing suggests that the petitioner changed his account of the events between the time he completed the asylum application and the time he gave his oral testimony. A failure to state each and every ground for a claim of political asylum at the time of the initial application should not prejudice that claim, and particularly not where the petitioner subsequently provides documentation to

---

7. We have previously held that a petitioner's admission that he lied to the INS about his citizenship does not support a negative credibili-

ty finding. *Turcios*, 821 F.2d at 1400–01. We require IJs to evaluate such statements in light of all the circumstances of the case.

33=

support his testimony. Thus, the IJ's finding that petitioner lacked credibility for this reason is wholly without merit, or, as *Damaize–Job* puts it, not "legitimate." 787 F.2d at 1338.

■ Moreover, on a matter as important as this, if an asylum applicant's plea is to be rejected and he is to be returned home—possibly to face renewed threats to his life—simply because an IJ doubts his credibility, the IJ must make a more explicit and direct finding that he is untruthful than was made here. The mere statement that a petitioner is "not entirely credible" is not enough. As we did in *Turcios*, "[w]e find that the statement of reasons given for rejecting [Aguilera's] detailed testimony inadequate and that substantial evidence does not support the adverse credibility finding." *Turcios*, 821 F.2d at 1399.[8]

■ Other than the minor omission and the other insignificant reasons given by the IJ, there is in the case before us "a 'total absence of contradictory evidence' in the record as a whole that potentially undermines [the petitioner's] credibility." *Damaize–Job*, 787 F.2d at 1338. Under these circumstances, we accept the testimony as true. We explained the reasons we do so in *Damaize–Job*, saying "[w]e presume that if the IJ had any additional reasons to doubt [the petitioner's] credibility, the IJ would have stated so in the decision below. Because the IJ expressed no further concerns, and the only explicitly articulated reasons rested on impermissible factors,

then we conclude from the IJ's opinion that [the petitioner] was an otherwise credible witness." *Id.* (citation omitted).

■ It is clear from a reading of the IJ's opinion that wholly aside from the credibility question, he found Aguilera's testimony insufficient to establish eligibility for asylum. We discussed the IJ's reasons for reaching that conclusion earlier, and pointed out the legal errors on which the conclusion was premised.[9] The evidence adduced by Aguilera, when properly credited and when viewed in light of the applicable legal principles, compels the opposite conclusion—namely, that Aguilera *is eligible* for asylum. We have previously held in other cases in which Salvadorans were subject to threats by extremists that evidence of the type adduced here is sufficient to establish a well-founded fear of persecution. In most of these cases, the evidence consisted solely of the petitioner's own testimony. In a number of the cases involving threats of violence to Salvadorans, we even held that the petitioner's testimony met the more stringent standard of clear probability of persecution,[10] while *a fortiori* satisfying the well-founded fear of persecution standard. *See, e.g., Canjura–Flores v. INS*, 784 F.2d 885, 889–90 (9th Cir.1985) (efforts of the National Guard to locate the petitioner, combined with the death of an uncle, and prior participation in a leftist organization, were sufficient to establish a clear probability of persecution, and thus *a fortiori* a well-founded fear);

---

8. The government contends that the petitioner failed to raise the credibility issue before the BIA and thereby waived that issue. We disagree. The petitioner's challenge to the IJ's conclusion that his testimony failed to carry the burden of proof is sufficient to comprehend the credibility component of that finding. Moreover, since petitioner's application was supported almost exclusively by his own testimony, there would be no purpose at all to an appeal if it did not include a challenge to the credibility determination. In any event, the parties are in agreement that the BIA adopted the IJ's finding that the petitioner was "not entirely credible."

9. As noted *supra*, the BIA's opinion appears to accept generally the IJ's legal and factual analyses, and neither party suggests otherwise. We

also note that the BIA ruled against petitioner after a plenary review of the record and the issues, having first decided to deny the INS' motion for summary affirmance.

10. In *Cardoza–Fonseca*, 480 U.S. at 441, 107 S.Ct. at 1218, the Supreme Court clearly delineated the distinction between the two standards. In order to obtain withholding of deportation under section 243(h), the individual must show that his life "would be threatened" if deported, a more stringent standard than under section 208(a). The latter section requires only a showing of well-founded fear of persecution. We have held that "an alien who has met the clear-probability standard has, *a fortiori*, demonstrated a well-founded fear of persecution." *Bolanos–Hernandez*, 767 F.2d at 1288.

*Rivas*, 899 F.2d at 873 (although the petitioner was politically neutral, she established a clear probability of persecution, and thus *a fortiori* a well-founded fear, because the government attributed the political opinions of guerrilla family members to her); *Artiga Turcios v. INS*, 829 F.2d 720, 724 (9th Cir.1987) (incidents involving guerrillas with threatening appearance, searching and asking for the petitioner by his military name, were sufficient to meet the clear probability of persecution standard, and thus *a fortiori* the well-founded fear standard); *Turcios*, 821 F.2d at 1403 (in spite of his political neutrality, the petitioner, arrested and tortured for conversing and associating with a known leftist, demonstrated a clear probability of persecution, and thus *a fortiori* a well-founded fear of persecution); *Bolanos–Hernandez*, 767 F.2d at 1288 (the petitioner's determination to remain neutral, in spite of efforts of the guerrillas to recruit him and their threat to kill him if he did not join their forces, was sufficient to demonstrate a clear probability of persecution, and thus *a fortiori* a well-founded fear of persecution). For purposes of the instant petition for review, Aguilera was required to meet the lesser standard only.

■ We have reviewed the record in full, and there is no evidence which suggests that Aguilera does not qualify for refugee status. Or to put it conversely, the record conclusively demonstrates that Aguilera is eligible for asylum relief. As in *Blanco–Comarribas v. INS*, 830 F.2d 1039, 1043 (9th Cir.1987), "We find, based on the record in this case, that [the petitioner] should have been granted refugee status." Under such circumstances, all that remains is for us to "remand [the petitioner's] claim to the Attorney General so that he may exercise his discretion under section 208(a) of the Act." *Id.* When a refugee has established a well-founded fear of persecution, the appropriate remedy is a reversal of the BIA's decision regarding eligibility for asylum and a remand to the Attorney General so that he may determine whether to grant that relief. *See also Canjura–Flores*, 784 F.2d at 890 ("Accordingly, we remand [the petitioner's] asylum

claim to the Attorney General so that he may exercise his discretion."); *Rivas*, 899 F.2d at 873 (same); *Artiga Turcios*, 829 F.2d at 724 (same); *Turcios*, 821 F.2d at 1403 (same); *Bolanos–Hernandez*, 767 F.2d at 1288 ("Because the Board erroneously determined that [the petitioner] was not eligible for asylum, the Attorney General has not had the opportunity to exercise his discretion in determining whether to grant this relief. We remand so that the Attorney General may now do so in accordance with the factors enumerated in 8 C.F.R. § 208.8 (1983).").

Here, as in *Bolanos–Hernandez*, 767 F.2d at 1288, "When the correct legal standards are applied, it is clear that the decision to deport [the petitioner] is not supported by substantial evidence. . . ." Because the BIA's decision is not supported by substantial evidence and because, when his testimony is credited, Aguilera has conclusively demonstrated a well-founded fear of persecution, we reverse and remand for the Attorney General's exercise of his discretion under section 208(a) of the Act.

REVERSED AND REMANDED.

TROTT, Circuit Judge, dissenting:

8 U.S.C. § 1158(a) provides that the Attorney General may in his discretion grant asylum to an alien who qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A) (1990). Section 1101(a)(42)(A) defines a "refugee" as, in relevant part, an alien "who is unable or unwilling to return to" his country of nationality "because of persecution or a well-founded fear of persecution on account of ... membership in a particular social group, or political opinion. . . ." To meet this standard, Aguilera–Cota must show his fear of persecution is "both subjectively genuine and objectively reasonable." *Blanco–Comarribas*, 830 F.2d 1039, 1042 (9th Cir.1987) (citing *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1579 (9th Cir.1986)).

Substantial evidence supports the Board's finding that Aguilera–Cota failed to establish a well-founded fear of persecution. Single episodes of the ransacking of

his house by the military, his receipt of a threatening anonymous note instructing him to resign from his temporary low-level job with the Salvadoran Board of Elections, and an inquiry made at his home regarding his job by a stranger; two episodes of his nearly being drafted by the Salvadoran military; and violence against his relatives unlinked to any danger to himself (all occurring more than five years ago) do not establish an objectively reasonable basis for fear of persecution. Aguilera–Cota has not shown that his "predicament is appreciably different from the dangers faced by all his countrymen." *Sarvia–Quintanilla v. INS*, 767 F.2d 1387, 1394 (9th Cir.1985). Evidence of generalized violence in a country by itself is insufficient to support a claim for "refugee" status. *See, inter alia, Mendez–Efrain v. INS*, 813 F.2d 279, 282 (9th Cir.1987); *Rebollo–Jovel v. INS*, 794 F.2d 441, 448 (9th Cir.1986), *Zepeda–Melendez v. INS*, 741 F.2d 285, 290 (9th Cir.1984). A national draft does not constitute persecution. *Rodriquez–Rivera v. INS*, 848 F.2d 998, 1005 (9th Cir.1988); *Kaveh–Haghigy v. INS*, 783 F.2d 1321, 1323 (9th Cir.1986) (per curiam). Aguilera–Cota has not shown persecution on account of his political neutrality as a form of political opinion. *See Rodriquez–Rivera*, 848 F.2d at 1005. Similarly, he has not shown persecution of Salvadorans who, like him, worked for the Board of Elections.[1] Further, evidence in the record suggests he is motivated by a desire to avoid the draft, not a genuine fear of persecution.

Moreover, the Immigration Judge made a specific adverse finding as to Aguilera–Cota's credibility, finding that "as a witness, [he] is not entirely credible." This finding extends both to whether his "fear" was genuine as well as to whether it was objectively reasonable. The majority opinion sweeps this finding away, paying only lip service to the requirement that we grant substantial deference to a trier of fact who rejects a witness's positive testimony because it lacks credibility.

In his written opinion of June 27, 1986, the Immigration Judge said the following:

Finally, this *so-called note* that the respondent allegedly received while he was working for the government is not a basis for a well-founded fear of persecution. First of all, it is *difficult to believe* why anyone would be interested in a low-level employee of the El Salvadoran government and would be interested in serving him with any note to quit his employment. Respondent, *of course*, has no idea who slipped the note under the door. The note was *never shown* to anyone else. We only have the respondent's testimony that he did in fact receive a note. *Respondent as a witness is not entirely credible*. His *testimony in the hearing varies from the information submitted on the application for asylum*. He mentions incidents in his testimony that are not brought out or even mentioned in the application for asylum.... The man that came to his home looking for him in his absence (*almost always it seems that these things happen in respondent's absence*) does not provide us with sufficient information to determine who was looking for him or why. This *so-called stranger* apparently never returned to his home because his family continued [sic] to reside in the same home today. It is *difficult for me to see* after a period of more than two years why respondent would have any fear if he were to return to El Salvador today. (Emphasis added)

What more was the Immigration Judge to do? He cited prior inconsistent statements, reasons to believe aspects of Aguilera–Cota's testimony were made up, apparently phantom strangers and disappearing bearers of notes, and claims that on their face are hard to swallow. Plus, an alternative explanation for his flight appears on the record: he wishes to avoid military duty. In my view, the majority opinion inappropriately substitutes its view of the witness's credibility for that of the Immigration Judge, and it does so, with all re-

---

1. It is also noteworthy that the United States Department of State's Bureau of Human Rights and Humanitarian Affairs issued an advisory opinion to the effect that Aguilera–Cota failed to establish a well-founded fear of persecution in El Salvador.

spect, in disregard of basic principles of standard of review jurisprudence. In *Blanco–Comarribas,* the immigration judge stated: "I have observed [the respondent's] physical demeanor on the witness stand, and it appears to be candid, credible and sincere." 830 F.2d at 1042. That was all it took to establish the requisite subjective fear. Here, the immigration judge explained his view of the adverse credibility of the petitioner, but we relegate his observations and findings to the trashpile, finding diaphanous excuses for everything.

I would affirm the decision of the Board of Immigration Appeals.